Wbygandt, C. J.
 

 Was the Court of Appeals 'correct in reversing the judgment rendered by the trial court in favor of the defendant • Thompson on the pleadings and the evidence
 
 non obstante veredicto¶
 

 The collision occurred while the decedent was riding to work in an automobile owned and driven by the defendant Thompson.
 

 In substance, the plaintiff alleges in her amended petition simply that each of the three defendants was negligent.
 

 In the amended answer of the defendant Thompson he denies that he was negligent. He then alleges that the decedent was riding with him as his guest. He also “denies that he was guilty of any wilful negligence or wanton misconduct.”
 

 In the plaintiff’s reply she denies that the decedent was a guest of the defendant Thompson. Then she alleges that the “decedent, the said defendant, and a certain Bevington at the times and places set forth in plaintiff’s petition, were engaged in employment at
 
 *289
 
 Cleveland, and liad been, for a long period prior to the happening of the accident, in the amended petition set forth, and plaintiff’s decedent was riding in the automobile of said defendant, under an agreement made by the defendant, plaintiff’s decedent and said Bevington, for the mutual benefit of either of them, by which each one furnished transportation in his automobile for the others, every third week, in return for the furnishing of such transportation by each of the others in turn; each party, at the time of furnishing such transportation, pursuant to such agreement, paying the expenses for the operation of his own automobile. ’ ’
 

 The statute under which the amended answer and reply are drawn is Section 6308-6, General Code, which reads as follows:
 

 “The owner, operator or person responsible for the operation of a motor vehicle shall not be liable for loss •or damage arising from injuries to or death of a guest while being transported without payment therefor in or upon said motor vehicle, resulting from the operation thereof, unless such injuries or death are caused by the wiful or wanton misconduct. of such operator, owner or person responsible for the operation of said motor vehicle.”
 

 Howevér, it should be noted that‘this controversy presents no question involving a construction of this statute.
 

 Likewise, it is important to note that the plaintiff makes no claim of wilful or wanton misconduct on the part of the defendant Thompson.
 

 Thus this matter is simplified and reduced to the single question whether the record discloses conflicting evidence as to the relationship existing between the decedent and the defendant Thompson on September 16, 1940. The trial court held that there is no conflict on this issue and that there is no evidence tending
 
 *290
 
 to show that the decedent was other than a guest. Therefore, if the evidence tends to show merely that the decedent was a guest of the defendant Thompson the trial court was correct in rendering judgment for the latter, inasmuch as there is no claim of wilful or wanton misconduct. If, however, the record does contain evidence tending to show that the decedent was other than a guest the trial court was in error, since there is ample evidence to permit the plaintiff to recover from the defendant Thompson on the theory of simple negligence on the part of the- latter in driving his automobile.
 

 What does the record disclose? Goncededly, about a year before the collision there was an agreement involving Bevington, Thompson, and the decedent as alleged in the plaintiff’s reply. Concededly, too, this arrangement was discontinued. Later another and somewhat similar agreement was made among the three.. The specific question presented is whether there is evidence tending to show that this agreement remained in effect on the day of the collision. Two days previously thereto the deicedent Shryock purchased a new motorcycle for the purpose of transporting himself to and from his place of employment. He immediately drove the motorcycle to the home of Thompson and advised‘the latter of his plan to start driving to work the following Monday which was the day of the collision. When Monday morning arrived Bevington drove to work alone. Thompson likewise started alone but went out of his way to pass Shryock’s home in order to invite the latter to ride with him because of the fog. When he reached the home he saw the new motorcycle on the lawn, and found Shryock dressed in riding trousers, riding boots and leather jacket, and ready to ride his motorcycle to his work. Thompson’s testimony reads in part as follows:
 

 “Q. Now, yon drove to work or started to drive to
 
 *291
 
 work on the following Monday morning, September 16, .is that true, Mr. Thompson? A. Yes, sir.
 

 “Q. Now, the evening before that, Sunday night, did you know you were going to drive and stop at .Shryock’s place the nest morning? A. No.
 

 “Q. Had you called Shryock about stopping? A. No.
 

 “Q. Had he called you about it? A. No.
 

 “Q. What was the occasion for your driving past .his place then on Monday morning? A. It was such .a bad morning.
 

 “Q. Bad in what respect, how was it bad? A. Fog.gy, misty'.
 

 “Q. And when you got to Fred Shryock’s place that Monday morning, as you drove up there did you .see him out anywhere? A. No.
 

 “Q. Did you see his motorcycle? A. Yes.
 

 “Q. Where was it? A. Along side the drive on the edge of the lawn.
 

 “Q. And what did you do as you stopped there? .A. Blew the horn.
 

 “Q. And then what did you see Shryock do, if anything? A. He come out the door.
 

 “Q. How was he dressed?- A. He had on his riding .boots, riding pants and leather jacket to go to work.
 

 - “Q. You say a leather jacket? A. Yes.
 

 “Q. And you say riding boots? A. Yes.
 

 “Q. What kind of boots did he have on? A. Leath- • er boots.
 

 “Q. What kind of pants did he have on? A. Rid- ■ ing pants.
 

 “Q. Now what is the fact as to whether or not you invited him to ride with you that morning after you . got there? A. I did.
 

 “Q. And did he get in your car to ride with you? ..A. Not right away.
 

 
 *292
 
 “Q. Did lie eventually get in your car to ride with you? A. Yes.
 

 “Q. What, if anything, did you see him do with his riding boots before he got in your car? A. We talked a little while.
 

 ‘ ‘ Q. What did you see him do with his riding boots ? A. He got in' the car with them on.
 

 “Q. You see him take them off? A. Yes.
 

 “Q. Where did he put them? A. In the back seat.
 

 “Q. What did he put on his feet? A. Shoes.
 

 “Q. Now, did he pay you anything for that ride that morning? A. No, sir.
 

 “Q. Did he promise to pay you anything for that ride? A. No, sir.
 

 “Q. Was there any agreement of any sort between you that you should get anything for taking him along that morning? A. No.”
 

 A careful study of the record discloses no evidence in conflict with the foregoing testimony. Hence the trial court manifestly was correct in holding that there is nothing to indicate a relationship other than that of a guest. The agreement among the three men clearly had been discontinued two days previous to the collision, and was not thereafter revived.
 

 This court is unanimously of the opinion that the judgment of the Court of Appeals must be reversed and that of the trial court affirmed.
 

 Judgment reversed.
 

 Matthias, Hart, Zimmerman, Bell, Williams and Turner, JJ., concur.